## GEORGE WRIGHT YOUNG

### v.

## JOHN V. FARWELL ET AL.

*Master and Servant—Recovery of Compensation—Contingent Profits —Accounting.*

1. It is not necessarily a reflection upon the veracity of a person that he shall not at all times be able to give an exact repetition of his recollection of a matter of business.

2. Courts may and should, in cases of doubt, give to words contractually employed, such a meaning as will effectuate the intention of the parties, and such intention may be gathered from all the circumstances surrounding the transaction; but when from a consideration of all the circumstances it is impossible to determine what it was that the minds of the contracting parties met upon, the contract must fail.

3. Upon a bill filed for an accounting upon an alleged verbal contract, whereby complainant was to perform services for defendants for a certain fixed salary, and under certain conditions a share of profits in a particular department of defendants' business, this court holds, much uncertainty existing in the evidence as to how the contingent profits to be divided were to be ascertained, and also as to the ratio of the division of the profits when they should be once ascertained, that the decree dismissing the bill must be allowed to stand.

4. An agreement to "divide" contingent profits does not mean to divide equally, when it is uncertain from the whole contract, that such was the intention of the parties.

[Opinion filed October 28, 1892.]

APPEAL from the Circuit Court of Cook County; the Hon. O. H. HORTON, Judge, presiding.

Mr. A. D. CURRIER, for appellant.

Messrs. FLOWER, SMITH & MUSGRAVE, for appellees.

MR. JUSTICE SHEPARD. The appellant filed his bill in this cause for an accounting with appellees upon an alleged verbal contract whereby appellant was to perform services for appellees for a certain fixed salary, and, under certain conditions, a share of profits in a particular department of appellees' business as merchants.

Appellees conduct a large wholesale dry goods business, divided in its management into departments with separate heads or overseers, although under one general management. Appellant had been in appellees' employment for a good many years and for several years had been sub-head of the department of silks and velvets, at a salary, for the year 1888, at least, of $2,250. In December, 1888, he was notified that for the year 1889 his salary would be reduced to $2,00°, and he acquiesced in the reduction.

At that time, and afterward, John V. Farwell, Jr., a member of the appellee firm, was the general manager of parts of the business of appellees, including the department of dress goods and silks.

The head of the dress goods department resigned his employment and left in June, 1889. On June 21, 1889, an in terview took place between appellant and Farwell, junior, concerning the conduct of the business of that particular department by the appellant for the balance of the year, and a contract between the two was entered into.

The contract, whatever it was, was a verbal one. The appellant and Farwell, junior, were the only persons present, and their testimony furnishes the only evidence of what it was, outside of some written correspondence between them concerning it after the close of the year.

Considerable comment has been indulged in by counsel

upon both sides, because neither of these two witnesses on each one of several occasions when called upon to express his recollection of the terms of the contract, has stated it twice alike. Such a variation in testimony may well be pardonable, and is quite consistent with common experience in the observation of testimony given after a considerable lapse of time, concerning verbal contracts.

It is not necessarily a reflection upon the veracity of a witness that he shall not at all times be able to give an exact repetition of his recollection of a matter of business.

It is certain that in that conversation Farwell, junior, agreed to make the salary of appellant for the balance of the year, from July 1st to December 31st, at the rate of $2,250 a year; and it is equally certain that something in addition to such an increase of salary was agreed upon in that same conversation. Upon what that additional agreement was, depends the controversy between the parties.

The testimony of both appellant and Farwell, junior, is that appellant was insisting upon an increase of salary—one says to $4,000 and the other to $3,000 a year—in view of appellant assuming the increased responsibilities and labors incident to the filling of the position of head of the department rendered vacant by the resignation of the person formerly occupying it. Farwell, junior, refused to increase the certain and fixed salary above $2,250 and appellant refused to accept that salary alone. Thereupon it was that Farwell offered some division of contingent profits in the business of the department, as an additional inducement to appellant, and the offer was accepted.

Much uncertainty exists in the evidence as to how the contingent profits to be divided were to be ascertained, and also as to the ratio of the division of the profits when they should be once ascertained.

Appellant, in his letter of February 21, 1890, says: "As a compromise for your not doing more than reinstating the amount of salary of previous two years, you offered to divide, if I did well, and the profits was good under my management."

On direct examination appellant testified that Farwell,

junior, said, " We will divide with you all the profits made over the past percentage," and repeated the same thing in substance on cross-examination. Upon being recalled in rebuttal he testified that Farwell, junior, said : " I will divide with you all the profits that your department makes over your past average percentage of profits."

Mr. Farwell, junior, testified in behalf of appellees, that all that was said by him beyond agreeing to make appellant's fixed salary at the rate of $2,250 a year, was, " and if you do well we will give you a bonus." In replying, under date of February 25, 1890, to appellant's letter of the 21st of that month, already quoted from, Mr. Farwell, junior, writes :

" By my remarks to you on the 21st of last June, I meant that if the department did only what ought to be done by any good manager, you would not receive any additional compensation, but that if it made more than its regular percentage I was willing ' to divide,' not in two equal parts, the extra amount, but to give you part of it. You made about $2,500 over your percentage and I am willing to give you ten per cent of it, or $250."

What has been quoted comprises all the positive evidence in the case as to what the contract really was.

We think the weight of the evidence clearly establishes that Farwell, junior, in that conversation did promise appellant to " divide " with him some contingent surplus. There is no other inference to be drawn from the phraseology of his letter of February 25th, and all the circumstances surrounding the transaction tend to corroborate the testimony of appellant as to the use of that word " divide " having been made.

The conversation was being had for the purpose of offering by Farwell, junior, and receiving by appellant, an inducement for appellant to remain at least a half year longer in appellees' service. Under the conditions then existing between the parties, and the undisputed fact that appellant expressly refused to remain any longer and assume greater responsibilities and labor without the expectation of a material increase in compensation, it is highly improbable that he would have suddenly abandoned both an express agreement

for, and all definite expectation that he might receive greater pay, by accepting the promise of a mere "bonus," which might be little or much, according to the whim or caprice of the other party. Such is not the way persons of sound sense make agreements, and the record shows that on all other occasions, covering annual engagements for some thirteen years, exact terms were used by both the parties.

Neither do we entertain much doubt but that appellant understood the word "divide," as it was then employed, to mean to divide equally; but it is by no means established that Farwell, junior, meant any such terms of division.

There has been no attempt to prove that the word "divide" has any technical meaning when employed as it was in the contract under consideration. It may not be unusual in every-day conversation for the word to be used and understood as expressive of equality, but no case has been cited, and we are aware of no authoritative definition that so holds; and we can not say that the word has acquired any such general and ordinary meaning of equal division as to warrant us in giving it that sense. While to so interpret it would give to appellant what he expected, for giving it any other sense would deprive him of all certainty in the contract and leave him as much at the mercy of appellees as if only the word "bonus" had been employed, yet on the other hand there can be no safely drawn inference that appellees contemplated any such a meaning as would put their large capital invested in a department doing an annual business of $600,000, on terms of equality, after payment of some usual percentage, with the services of one man alone.

Courts may and should, in cases of doubt, give to words contractually employed, such a meaning as will effectuate the intention of the parties, when such intention may be gathered from all the circumstances surrounding the transaction; but when from a consideration of all the circumstances it is impossible to determine what it was that the minds of the contracting parties met upon, the contract must fail. We also think that the contract must fail because of other indefiniteness.

Assuming that the contract was to divide into definite

parts a contingent profit, the amount of the profit to be so divided must be susceptible of ascertainment upon a basis expressly fixed by the contract, or found to have been intended by the parties.

It appears that, by a rule or custom of appellees, all goods placed in the department of silks and velvets were in the first instance, inventoried to that department at cost, with fifteen per cent added, and that the percentage so added was called "regular percentage." This percentage was what was fixed upon by the appellees as something that ought to be realized, and if obtained, amounted to a thoroughly satisfactory result. With a less percentage of profit, satisfaction with the conduct of the department varied in degree. Profits in that department had not reached the "regular percentage" of fifteen per cent for several years before the making of the contract in controversy, but had varied from eight to twelve per cent, and this range of profits was well known to all the parties. It is also in evidence as well as apparent from the mere statement, that the measure of profits would be proportioned in some degree upon the method adopted in taking the annual, or more frequent, inventories of the old stock as well as the new.

Enough has perhaps been said upon the subject of the conduct of the business to show that three kinds of percentage might have been referred to understandingly by the parties when speaking of the affairs of the department, viz., *regular percentage, past percentage* of the *last* or any *other* year, and the past *average percentage* of several past years. One would mean a profit of fifteen per cent, another, the profit of the last preceding year, or any one of several years last past, and the other the average profit of the last past several years.

Appellant on direct and cross-examination testified that the thing to be divided was "all the profits made over the past percentage." Being called later, in rebuttal, he testified it was "all the profits that your department makes over your past average percentage of profits."

Young v. Farwell.

In his letter of February 21, 1890, he says it was "to divide, if I did well, and the profits was good."

In his letter of July 5, 1890, he says the agreement was "to divide with him the surplus above past percentages made."

Farwell, junior, in his letter of February 25, 1890, says the agreement was that if the department "made more than its regular percentage I was willing to divide," etc.

In his testimony, Farwell, Jr., says that nothing was said about percentages when the contract was made; that all that was said was "if you do well we will give you a bonus."

There is in this testimony, which comprises all there was on the particular question now being considered, much confusion, and some contradiction, not only between the witnesses, but between their own statements, made at different times, of what the agreement was.

And the terms of the contract in this regard were most material.

The sales for the six months in question, exceeded $300,000. Every one per cent of profit, over any percentage, was, therefore, equal to over $3,000, and the five per cent between fifteen or "regular percentage," and ten or "average percentage" (between past percentages of from eight to twelve per cent), exceeds $15,000.

It is not the province of courts to make contracts for parties, nor to make certain and definite what parties have carelessly left uncertain and indefinite, unless their intention is clearly and satisfactorily proven.

In our opinion the Circuit Court properly dismissed the bill, and its decree will therefore be affirmed.

*Decree affirmed.*

Mr. Justice Gary, dissenting. The parties were not jesting, but engaged in a business transaction.

With the context, "divide" meant into two equal parts, and the letter of February 25, 1890, shows that at least there was the sum of $2,500 to divide, and therefore if neither party goes into an account, there is the sum of $1,250 that appellant ought to have.